UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>MICHAEL A. PULIS,<br><br>Debtor. | Case No. A11-00366-GS<br><br>Chapter 7 |
| THOMAS CANTRELL,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL A. PULIS,<br><br>Defendant. | Adv. No. A12-90008-GS |

**MEMORANDUM DECISION**

In this adversary proceeding, plaintiff Thomas Cantrell seeks revocation of debtor Michael Pulis's discharge pursuant to 11 U.S.C. § 727(d)(1). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J). This court has jurisdiction over the dispute in accordance with 28 U.S.C. § 1334(b) and the district court's order of reference. I find for the defendant.

**FACTUAL BACKGROUND**

The plaintiff, Thomas Cantrell, entered into an agreement to purchase debtor Michael Pulis' classic car for $187,000. Cantrell paid about $97,000 over time for the vehicle but, for reasons which are not in the record, did not fully consummate the sale. He asked Pulis

to instead sell the vehicle to someone else and refund his payments. Pulis did sell the vehicle, but never paid Cantrell. Cantrell filed suit in Anchorage Superior Court and, on January 23, 2009, obtained a *Final Judgment* of $111,438.00 against Pulis.[1] Cantrell, through his attorney Calvin Jones, began to pursue collection of the judgment in 2010. Cantrell also retained counsel in Kansas to depose Pulis' mother, Rose Pulis, in April 2010. Cantrell discovered that Pulis held a 1/8 interest in three parcels of real property located in Newton, Kansas, together with his mother and other members of his family. Shortly thereafter, Cantrell domesticated his judgment in Kansas to perfect a lien against Pulis' interest in the real property. Additionally, Cantrell began to garnish Pulis' wages. Through post-judgment wage garnishments, Cantrell recovered approximately $33,500 on the judgment before Pulis filed his chapter 7 petition on May 9, 2011.

     Pulis testified that he filed bankruptcy because the wage garnishment was burdensome. The garnishment was taking one-quarter of his pretax income every month. Pulis did not make the decision to file lightly, but testified that at the rate Cantrell's judgment was being paid through garnishment, he would die before it was paid off. Pulis filed on his own behalf, and prepared his own petition and matrix. Roughly a month later, Pulis filed his schedules and statement of financial affairs, which he also prepared without the assistance of counsel. Pulis included Cantrell's judgment on his *Statement of Financial Affairs*, and

---

[1] Pl.'s Ex. 1 (Judgment entered in Case No. 3AN-07-11301 CI).

also indicated that his wages had been garnished by Jones prepetition.[2] On *Schedule D*, Cantrell was listed as a secured creditor, with a judgment lien for $111,438.00, though Pulis indicated the claim was disputed.[3] Pulis amended his *Schedules* on August 16, 2011, and moved Cantrell to his *Schedule F - Creditors Holding Unsecured Nonpriority Claims*.[4] On the matrix, the service address Pulis provided for Cantrell was c/o his attorney Jones, at 1900 W. Benson Boulevard, Anchorage, Alaska, 99517.[5] Notice of Pulis' bankruptcy filing was mailed to Jones at the Benson Boulevard address on May 12, 2011.[6]

Pulis' initial § 341 meeting was held on June 24, 2011. The meeting was continued to July 26, 2011, and then to August 17, 2011, because the trustee had requested additional information. Pulis attended all of these meetings. The chapter 7 case trustee, William Barstow, filed a report of no distribution on August 18, 2011. Pulis' discharge was entered on October 13, 2011.

Roughly two weeks before entry of his discharge, Pulis filed a *Notice Regarding Attorney Harassment* with the court, in which he complained that Jones was continuing to

---

[2] Pl.'s Ex. 7 at 2, 3.

[3] Pl.'s Ex. 6 at 7. This is the exact amount of the *Final Judgment*.

[4] Pl.'s Ex. 8.

[5] Pl.'s Ex. 9 at 1.

[6] *BNC Certificate of Notice*, filed May 12, 2011 in Main Case No. A11-00366 (Docket No. 11). Pulis testified that he used the Benson Boulevard address for Jones on his creditor matrix because it was one of two addresses he found for Jones via an Internet search, and was the address he was familiar with, having had his deposition taken at this location in the state court litigation. He also testified that Jones' Benson office was a fairly good size, so when he found two addresses for Jones from his Internet search, he thought perhaps Jones had two office locations.

3

pursue collection of the Cantrell judgment postpetition.[7] On October 21, 2011, the court entered an order setting a hearing on the debtor's *Notice.* The court served the order on Jones at both the Benson Boulevard address used in the debtor's matrix, and a C Street address used on several of Jones' pleadings from the state court action attached to the *Notice*.[8] At the hearing on the *Notice,* held December 16, 2011, the parties advised the court that the matter had settled. A final decree was entered, and Pulis' chapter 7 bankruptcy case was closed, on December 21, 2011.

On March 30, 2012, Cantrell filed the instant adversary proceeding. The complaint alleges that: 1) Pulis transferred an interest in real property in Kansas to his mother, three days before filing his petition, with the intent to hinder, delay or defraud his creditors, and

---

[7] *Notice Regarding Attorney Harassment*, filed Sept. 30, 2011 in Main Case No. A11-00366 (Docket No. 32).

[8] Many of these pleadings were dated after the filing of Pulis's petition, and reflected both the Benson Boulevard and C Street addresses. They included the following:

- a *Motion to Compel Discovery* from the state court case, dated September 16, 2011, and signed by Jones. The *Motion* bears the Benson Boulevard address for Jones in margin and at the top of page 1;

- a *Certificate of Mailing* dated June 10, 2011, regarding service of a *Notice of Taking Deposition*, signed by P. J. Bousselaire, a paralegal in Jones' office, bearing the Benson Boulevard address at both the top of the page and in the margin; and

- a proposed *Order Compelling Discovery*, directing Pulis to respond to discovery by no later than September 30, 2011, with a certificate of service signed by P. J. Bousselaire, bearing the Benson Boulevard address at both the top of the page and in the margin.

*Id.* at 45-46. The inconsistency in addresses was also reflected in the papers Jones filed in the main case in response to Pulis' *Notice*. *Compare Response to Order Setting Hearing* (C Street), *Affidavit* and the *Affidavit of P. J. Bousselaire*, (Docket Nos. 36, 37 and 38, filed Oct. 25, 2011 in Main Case No. A11-00366) (C Street), *with Certificate of Service* (Docket No. 39, filed Oct. 25, 2011 in Main Case No. A11-00366)(Benson Boulevard).

4

2) Pulis made a false oath because he did not disclose the Kansas property or the transfer to his mother on his schedules and statements, nor to the trustee at the creditors' meeting, thus precluding the trustee from recovering the transfer as a fraudulent conveyance.  Cantrell alleges that these acts would justify denial of discharge under 11 U.S.C. § 727(a)(2) and (4), and constitute fraudulent conduct under 11 U.S.C. § 727(d)(1), such that Pulis' discharge should be revoked.  The complaint also alleges that Pulis' failure to list Jones' current C Street address on the matrix precluded Cantrell from filing a timely objection to Pulis' discharge, because his office didn't learn of Pulis' bankruptcy filing until after discharge had been entered.

## THE KANSAS REAL PROPERTY

During the course of post-judgment discovery in the state court action, Cantrell learned that Pulis had relatives in Kansas.  Cantrell, through Jones, retained attorney David Stucky of Newton, Kansas, to register an exemplified copy of the *Final Judgment* in Harvey County, Kansas, where Pulis' mother resides.  The registration of the judgement created a lien against any interest Pulis held in real property located in that county.  Stucky also took the deposition of Pulis' mother, Rose, on April 15, 2010.  Rose had three parcels of real property in Newton, Kansas (the "Kansas property"), which she placed on the market sometime in 2011 under the assumption that only she and her now deceased husband had been on the title.  She learned through her realtor, however, that Pulis, and his sister, had

each acquired a 1/8 interest in the Kansas property when their father died intestate in 2006. At the same time, she also discovered that Pulis' interest was encumbered by the Cantrell judgment, complicating any sale of the property.

By late April, 2011, Rose's attorney, John Robb, had contacted Stucky to discuss Rose's efforts to sell the Kansas property, and address Cantrell's judgment lien. Robb also had Rose send Pulis, and his sister, separate deeds to convey their fractional interests in the Kansas property to her to facilitate her ability to sell the property. On May 6, 2011, three days before he filed his chapter 7 petition, Pulis executed the deed conveying his 1/8 interest in the three parcels as a gift to Rose.[9] Rose's daughter also executed, and returned, a deed conveying her interest in the Kansas property to Rose. Robb sent Rose the recorded deeds from Pulis and his sister under cover of a letter dated June 24, 2011.[10] His letter stated that Rose "should now have marketable title in [her] name, subject to [Cantrell's] Judgment lien against Michael's 1/8 interest prior to his deed to you."[11] It also advised that Robb had contacted Stucky to explore settlement of Cantrell's judgment lien against the property.

Robb's first stab at negotiating a settlement with Stucky occurred before Pulis filed his bankruptcy petition.[12] On May 24, 2011, Robb sent Stucky an email "Re: Pulis Matter," which stated:

---

[9] Pl.'s Ex. 10.

[10] Def.'s Ex. H. Robb provided corroborating testimony at trial, as well.

[11] *Id.*

[12] Pl.'s Ex. 5 at 1.

6

> It has been almost a month and I have not heard back from you on this.
>
> I think the question is what will your client accept to release its judgment lien on my client's two rental houses. As I told you, they are listed for sale at $120,000 (combined). They may be worth less than this, as they have received no offers that I am aware of. Your judgment lien is against an undivided 1/8 of the real estate. If they sold for $90,000, the sale might clear about $82,000 ($5400 real estate commission, $2000 taxes, $1000 closing costs, all estimated). The maximum your client might receive would be about $10,000 for their judgment lien. If they don't sell, your client receives nothing. (My client has talked about simply moving into one of them.) To foreclose your judgment lien you will probably have $3000 in attorneys fees and costs and, at the end, you will be selling an undivided interest in real estate. Not much market there at sheriff's sale. You could partition the real estate and buy my client out and then sell the houses. All a significant amount of work and expense.
>
> I am willing to go to my client and see if she will offer your client $3000 for a release of the lien at this time. I have no authority to make this offer, but I will take that to my client if it seems acceptable to your client.[13]

Stucky responded to Robb on June 9, 2011.[14] He advised Robb that he was waiting for word from Cantrell and his Alaska counsel, Jones, regarding what they wanted to do. Robb sent Stucky additional emails on June 9, and October 10, 2011, advising that the property still had not sold.[15]

---

[13] *Id.*

[14] *Id.* at 3-4.

[15] *Id.* at 3.

Rose testified that the properties generated very little interest. She listed them at $120,000 but, in hindsight, believes this price was way too high. She has received no offers for them. She took them off the market after about one year, because of the title issues and problems with the way the lots were configured. There are two houses on the three lots, and both houses are rented. The houses are very old and the lots would be more marketable if they were subdivided. Rose receives monthly rent of $475 from one of the houses and $400 from the other. She took out a loan against one of the lots and the monthly loan payment is $590.45. She testified that, when taxes are factored in, she really does not make much on the lots, if anything, above her expenses. In any event, it is clear that the value of Pulis' interest in the lots is insufficient to satisfy the balance of Cantrell's judgment.

## ANALYSIS

Cantrell seeks revocation of Pulis' discharge under 11 U.S.C. § 727(d)(1), which provides:

> (d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if –
>
> > (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge[.][16]

---

[16] 11 U.S.C. § 727(d)(1). Revocation of discharge under subsection (d)(1) must be requested within one year after such discharge is granted. 11 U.S.C. § 727(e)(1). Cantrell's complaint is timely, having been

To prevail in this action, Cantrell must establish, by a preponderance of the evidence, that grounds exist to revoke Pulis' discharge.[17] Specifically, he must prove that Pulis "committed a fraud in fact which would have barred the discharge had the fraud been known."[18] Finally, Cantrell must show that he discovered such fraud *after* entry of Pulis' discharge.[19] Revocation of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge.[20] It is "an extraordinary remedy," appropriate in limited circumstances.[21] For this reason, objections to discharge, including revocations, are construed liberally in favor of the debtor, and strictly against the creditor.[22]

### A. Was the Discharge Obtained Through Fraud?

Cantrell argues that Pulis committed fraud because he concealed his prepetition transfer of the Kansas property "with the intent to hinder, delay, or defraud a creditor or

---

filed just over five months after Pulis' discharge was granted.

[17] *Grogan v. Garner*, 498 U.S. 279, 284 (1991); *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 730 (B.A.P. 9th Cir. 1999); Fed. R. Bankr. P. 4005.

[18] *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 924 (B.A.P. 9th Cir. 1994) (quoting *In re Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)).

[19] *Bowman*, 173 B.R. at 924 (citing *Ross v. Mitchell (In re Dietz)*, 914 F.2d 161, 163 (9th Cir. 1990)).

[20] *Bowman*, 173 B.R. at 924 (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)).

[21] *Bowman*, 173 B.R. at 924 (citing *Buckstop Lure Co. v Trost (In re Trost)*, 164 B.R. 740, 743 (Bankr. W.D. Mich. 1994)).

[22] *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1342 (9th Cir. 1986); *see also Tanasescu v. Bors (In re Bors),* 2012 WL 6575171, at *8 (B.A.P. 9th Cir. Dec. 17, 2012)

officer of the estate."[23] He also says Pulis "knowingly and fraudulently . . . made a false oath" in connection with the case by failing to disclose the transfer in his bankruptcy papers.[24] To justify a revocation of discharge Cantrell must establish that Pulis committed "fraud in fact," in that he actually intended to conceal the transfer, defraud his creditors, or make a false oath on his *Statement of Financial Affairs*.[25] Because debtors will rarely admit to having a fraudulent intent, "courts may deduce fraudulent intent from all the facts and circumstances of a case."[26]

Generally, intentional omissions from a debtor's schedules or statements are classic examples of obtaining a discharge by fraud.[27] Yet, not all omissions are fraudulent. Mere mistake or inadvertence, even arising from ignorance or carelessness, is insufficient to establish actual fraudulent intent.[28] As other courts have noted, the determination of

---

[23] 11 U.S.C. § 727(a)(2). Unlike § 727(a)(6), §§ 727(a)(2) and (a)(4) are not specifically incorporated into § 727(d). 11 U.S.C. § 727(d)(3). However, courts considering revocation of discharge have applied these other subsections of § 727(a) when determining whether a discharge should be revoked. *See, e.g., Hopkins v. Hugues (In re Hugues)*, 349 B.R. 72, 78 (Bankr. D. Idaho 2006).

[24] 11 U.S.C. § 727(a)(4).

[25] *Bowman*, 173 B.R. at 924. "Fraud in the air will not suffice." *White v. Nielsen (In re Nielsen)*, 383 F.3d 922, 925 (9th Cir. 2004).

[26] *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985).

[27] *Harrington v. Webster (In re Webster),* 2013 WL 145581, at *7 (Bankr. D. R.I. Jan. 14, 2013); *Hunerwadel v. Dulock (In re Dulock)*, 250 B.R. 147, 152 (Bankr. N.D. Ga. 2000).

[28] *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 884 (B.A.P. 9th Cir. 2005); *Estate of Ray Bishop v. Mulholland (In re Mulholland)*, 2011 WL 4352293, at *4 (Bankr. D. N.M. Sept. 16, 2011); *Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 374 (Bankr. E.D. Tenn. 2009).

fraudulent intent "often depends upon the demeanor and credibility of the debtor in explaining the reasons for failing to make full and complete disclosures.[29]

*In re Hugues*, 349 B.R. 72 (Bankr. D. Idaho 2006), is illustrative of a non-fraudulent omission of assets. The debtors disclosed a utility trailer with a value of $150, and a home-made hay trailer for $500, on their Schedule B. After their discharge was entered, the trustee discovered that the debtors also owned a fifth-wheel trailer. The trustee ultimately sold the fifth-wheel trailer for $12,000. The trustee sought to revoke the debtors' discharge under § 727(d)(1), for fraudulently misrepresenting or omitting the horse trailer from their schedules. The court found an absence of any pattern of wrongful conduct or an attempt to hide information on the part of the debtors. The debtors admitted that they had not scheduled the trailer, and when the issue was discovered, promptly turned over the trailer to the trustee. Moreover, with the exception of the omission of the fifth-wheel trailer, there were no other inaccuracies. The court also found the debtor's explanations for the omission to be credible. Mr. Hugues testified that he was not aware that the horse trailer was omitted. Mrs. Hugues explained that she believed their bank held title to the trailer because it was security for a loan. The court emphasized that the debtors' post-petition actions corroborated those explanations. Mr. Hugues, in a roundabout manner, discussed three separate trailers at the meeting of creditors although only two were listed on the Schedule B. The debtors' banker testified to post-petition conversations with Mrs. Hugues that confirmed her

---

[29] *Hugues,* 349 B.R. at 74; *Mulholland*, 2011 WL 4352292, at *4.

11

misunderstanding as to the distinctions between liens and ownership. The debtors' lack of financial sophistication further supported their explanations. Based upon "all relevant facts and circumstances," including their demeanor and lack of sophistication, the court concluded that trustee failed to show the requisite fraudulent intent to revoke their discharge.[30]

As in *Hugues*, the relevant facts and circumstances here fail to support a finding that Pulis omitted the transfer of his fractional interest in the Kansas property with the requisite fraudulent intent. The record amply demonstrates that there was never any attempt to conceal Pulis' fractional interest in the property. Quite to the contrary, it is clear that Cantrell knew of Pulis' fractional interest in the Kansas property well before the bankruptcy filing, and that all parties recognized Cantrell's judgment lien, even after the transfer. Rose's counsel, John Robb, attempted to reach a settlement as to the encumbrance, and advised Rose that, absent a settlement, "the Alaska attorney will likely demand his full 1/8 of whatever you sell the places for and you will have a time constraint to work under with a pending sale in even getting him to respond."[31] Cantrell's counsel in Kansas, David Stucky, later emailed Robb on November 1, 2011 to ask, "[o]ut of curiosity, do you have any information that you could share regarding how Mr. Pulis' interest was created and how it was transferred back?"[32] Robb replied that same day that Pulis acquired an 1/8 interest upon his father's death, and

---

[30] *Id*. at 80.

[31] Def's Ex. H.

[32] Pls Ex. 5 at 6.

that his interest was transferred back to Rose on May 6, 2012, providing the recording information as well. Robb concluded, "[t]he transfer back to mom does not make the title marketable due to the judgment lien we have tried to negotiate with you."[33] The continuous recognition of Cantrell's judgment lien strongly militates against any fraudulent intent.

The evidence also establishes that it was not Pulis' idea to transfer his interest to his mother. Both Pulis and his mother expressed surprise to discover that Rose did not solely own the property. Robb advised that the joint ownership would complicate any sale, and proposed that both Pulis and his sister convey their 1/8 interests to their mother. It was Rose that contacted Pulis and forwarded the deed to him. There is no evidence that Robb ever spoke directly to Pulis. Nor is there any evidence that either Rose or Robb knew of Pulis's intent to file bankruptcy, or if Pulis was aware that Cantrell had encumbered his interest in the Kansas property. Rather, Pulis' actions are consistent with his mistaken belief that he did not have any ownership interest in the Kansas property, though he thought that he would upon the death of both of his parents.

As in *Hugues,* Pulis also freely admitted the transfer, as well as his failure to specifically disclose it in his bankruptcy papers. Other than the omission of the transfer, there is no evidence of inaccuracy or wrongful conduct by Pulis. In fact, his *Schedule B,* filed *pro se*, appears consistent with Pulis' stated understanding that he had a *future* interest in the Kansas property. Pulis wrote "unknown" in response to Items 19 (equitable or future

---

[33] *Id.*

13

interests) and 20 (contingent and noncontingent interests in estate of a decedent). He did not simply check "none."

Nor does the court find anything untoward from Pulis' use of Jones' old mailing address on his creditor matrix. Pulis listed Cantrell as a creditor using the exact amount stated in the *Final Judgment*. The address he used was the one on the *Final Judgment* from which he took the total amount owed. Pulis testified that he pulled the address for Jones' firm, Jones & Colver, from the Internet. Though his search resulted in two choices, he chose the one with which he was familiar, on Benson Boulevard, saying that he believed the other address was an additional office for the firm. While it would have been prudent for Pulis to have listed both addresses, the court notes that Jones' post-petition pleadings have intermittently used the old address on Benson Boulevard as well as his current address on C Street. The court is convinced that there was no scheme on Pulis' part to keep Cantrell, or his law firm, in the dark regarding the bankruptcy. Pulis' *Notice* complaining of Cantrell's post-petition collection actions strongly corroborates his belief that Cantrell had been properly served with notice of the bankruptcy at the Benson Boulevard address.

Pulis mistakenly omitted the transfer of the Kansas property from his *Statement of Financial Affairs*. His explanation for the omission of the transfer is credible in light of his mother's efforts to sell the property, his sophistication, and his demeanor at trial. Further, Rose, as transferee of the property, made no effort to conceal Pulis' interest or defeat Cantrell's lien against Pulis' interest in that property. Given Cantrell's knowledge of Pulis'

14

interest in the Kansas property, and the continuous recognition of his judgment lien, there was no purpose to be achieved from concealing the transfer. Considering the entirety of the circumstances, the court finds that Cantrell has failed to prove by a preponderance of the evidence that Pulis procured his discharge by fraud.

### B. Did Cantrell Not Know of the Fraud Until After the Granting of the Discharge?

Cantrell must also prove that he did not know of the fraud until after the grant of the discharge.[34] The deadline to object to the debtor's discharge was August 8, 2011. The court did not enter the discharge, however, until October 13, 2011, due to issues arising from Pulis' stated intent to reaffirm a secured debt. Neither party has addressed the applicable date for purposes of § 727(d)(1).[35] Moreover, the only evidence presented at trial on this point was Jones' testimony that he could not recall when his office discovered the bankruptcy, and presumably would have discovered the alleged fraud.[36] However, this is a

---

[34] 11 U.S.C. § 727(d)(1).

[35] *Compare Ross v. Mitchell (In re Dietz),* 914 F.2d 161, 164 (9th Cir. 1990)(discharge is deemed entered for purposes of 727(d) upon the expiration of the deadline to object to discharge), *with Sherman v. Sec. and Exch. Comm'n (In re Sherman),* 491 F.3d 948, 966 (9th Cir. 2007)(under *Dietz*, a bankruptcy court *may* deem the discharge to have been entered immediately upon the expiration of the discharge deadline without objection).

[36] While Jones did recall receiving the court's October 21, 2011 *Order* setting a hearing on Pulis' *Notice Regarding Attorney Harassment*, this does not establish when the firm first learned of the bankruptcy. Indeed, when asked how his office became aware of the bankruptcy, Jones testified that he thought his paralegal had looked it up online. This statement is consistent with an affidavit from P.J. Bousselaire filed by Cantrell in the main case in opposition to *Pulis' Notice Regarding Attorney Harassment.* Bousselaire*,* a paralegal in Jones' office, stated that she discovered the bankruptcy on October 10, 2011, while investigating the reason why Cantrell had stopped receiving garnishment payments. *Aff. of P. J. Bousselaire*, filed Oct. 25, 2011 in Main Case No. A11-00366 (Docket No. 38), at 2, ¶ 7.

15

moot point, because the court finds that the debtor lacked the requisite intent to revoke his discharge.

## CONCLUSION

Under § 727(d)(1), a debtor's discharge must be revoked if the such discharge was obtained through actual fraud. For the reasons stated above, the court finds that Cantrell has failed to establish that Pulis did so here. This adversary proceeding will be dismissed, with prejudice.

An order and judgment will be entered consistent with this memorandum.

DATED: March 29, 2013.

        BY THE COURT

        /s/ Gary Spraker
        GARY SPRAKER
        United States Bankruptcy Judge

Serve: D. Bundy, Esq. (for plaintiff)
       M. Pulis, Pro Se Defendant